[Cite as *State v. Cameron*, 2024-Ohio-2427.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-635 |
| | | (C.P.C. No. 21CR-1486) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Bruce Cameron, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 25, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Wolfe & Mote Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, Bruce Cameron, appeals from the October 5, 2023 judgment of conviction entered by the Franklin County Court of Common Pleas after a jury found him guilty of murder and the trial court convicted him of aggravated robbery following a bench trial. Regarding the murder trial proceedings, Mr. Cameron attributes error to the trial court's finding that he was not entitled to a self-defense jury instruction and its admission of evidence concerning an expert ballistics report provided by plaintiff-appellee, the State of Ohio, after the Crim.R. 16(K) disclosure deadline expired. Mr. Cameron also argues his aggravated robbery conviction was not supported by sufficient evidence or, in the alternative, was against the manifest weight of the evidence.

{¶ 2} Because Mr. Cameron's three assignments of error are not well-taken, we affirm the judgment below.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

{¶ 3}  On April 15, 2021, a Franklin County Grand Jury returned a five-count indictment charging Mr. Cameron with purposeful murder (Count 1), felony murder (Count 2), aggravated robbery (Count 3), and two counts of having a weapon while under disability (Counts 4 and 5).  Three-year firearm specifications were included with the murder and aggravated robbery counts.  These offenses pertained to the shooting death of Dion Skipper in a hotel parking lot and subsequent theft of J.F.'s truck to flee the scene on April 4, 2021.

{¶ 4}  In advance of trial, the state notified the court of its intention to dismiss the felony murder count and its firearm specification (Count 2) and one of the weapon under disability counts (Count 5).  (*See* Sept. 25, 2023 Tr. Vol. I at 3.)  Mr. Cameron waived his right to a jury on the aggravated robbery and remaining weapon under disability counts.  Thus, a jury was charged with determining Mr. Cameron's guilt on the purposeful murder with firearm specification count, while the trial court was tasked with rendering a bench verdict on the aggravated robbery with firearm specification and weapon under disability offenses.

{¶ 5}  A jury trial on the murder with specification charge commenced September 25, 2023.  Evidence and testimony presented at trial established that Mr. Cameron, his girlfriend LaQuinta Howard-Smith, and her four children traveled to Columbus from Dayton on April 2, 2021 for a family weekend with Mr. Skipper (Ms. Howard-Smith's half-brother) and Mr. Skipper's son.  (*See* Sept. 26, 2023 Tr. Vol. II at 226-28, 251-52.)  The group stayed at the Norwood Inn Hotel. Mr. Skipper, his son, and Mr. Cameron shared one room, while Ms. Howard-Smith and her daughters shared another.

{¶ 6}  Prior to the April 4, 2021 shooting, the group's interactions with each other were generally pleasant and unremarkable. However, when Mr. Skipper intervened in a verbal disagreement between Mr. Cameron and Ms. Howard-Smith in the hotel's parking lot and punched Mr. Cameron in the face, Mr. Cameron responded by pulling out his firearm and shooting Mr. Skipper, thus resulting in his death.

{¶ 7}  At trial, Ms. Howard-Smith testified that on the night of April 4, 2021, around 10:00 p.m., she and Mr. Skipper walked out to the parking lot to pick up pizza for their children when they encountered Mr. Cameron leaning against her Trailblazer SUV. (*See* Tr.

Vol. II at 229-30; Ex. D2.) According to Ms. Howard-Smith, Mr. Cameron disagreed with her decision to get the children more food since they had already eaten dinner and Ms. Howard-Smith was tired. (*See* Tr. Vol. II at 228-30, 246.) Mr. Skipper intervened in the conversation between Mr. Cameron and Ms. Howard-Smith, telling Mr. Cameron: "[D]on't talk to my sister like that, she can do what she wants to do, who are you." (Tr. Vol. II at 230. *See also* Tr. Vol. II at 247-48.)

{¶ 8} Ms. Howard-Smith attempted to push Mr. Skipper back from Mr. Cameron several times, but Mr. Skipper pushed her away each time. (*See* Tr. Vol. II at 247-48. *See also* Ex. D2.) Suddenly, Mr. Skipper lunged at Mr. Cameron and punched him in the face. (*See* Tr. Vol. II at 231, 248; Ex. D2.) Although Ms. Howard-Smith indicated she was uncertain whether Mr. Skipper actually made contact with Mr. Cameron (Tr. Vol. II at 231), the detectives who interviewed Mr. Cameron the next day remarked on noticeable swelling and puffiness under his right eye and Mr. Cameron told them he was struck during the encounter. (*See* Ex. N at 5:30, 19:20, 31:10, 33:20.)

{¶ 9} Surveillance video of the hotel parking lot played during trial depicted the encounter and generally supported Ms. Howard-Smith's account, though none of the hotel surveillance videos presented at trial had audio. (*See* Ex. D2. *See also* Tr. Vol. II at 238-46; Ex. D3.) On review, we note the considerable size difference between Mr. Skipper, who weighed 356 pounds and was 6 feet tall (Ex. I), and Mr. Cameron, who was appreciably smaller. (*See* Ex. D1; Ex. D2. *See also* Tr. Vol. II at 248.)

{¶ 10} After Mr. Skipper struck Mr. Cameron, the surveillance video showed Mr. Cameron run to the far side of a car parked just two spots away from Ms. Howard-Smith's SUV. (*See* Ex. D2. *See also* Tr. Vol. II at 249.) Ms. Howard-Smith testified she stood between the two men in the empty parking space and told them "we don't live here, why are you guys doing this, you need to stop, [Mr. Skipper] go back in or get in the car." (Tr. Vol. II at 231-32. *See also* Tr. Vol. II at 240-41.) Surveillance video then showed Mr. Skipper walk past Ms. Howard-Smith toward Mr. Cameron while Mr. Cameron moved away to grass surrounding the parking lot. (*See* Ex. D2. *See also* Tr. Vol. II at 248-49.) Essentially, Mr. Cameron stood in the grass between the parked car and the bordering fence while Mr. Skipper, standing in the parking lot, moved back and forth near the opposite end of the same car. (*See* Ex. D2. *See also* Tr. Vol. II at 248-49.)

{¶ 11} The surveillance video then showed Mr. Cameron walk past the driver's side of the car toward Mr. Skipper, pull out a firearm, and shoot Mr. Skipper five times. (*See* Ex. D2. *See also* Tr. Vol. II at 249-50.) Mr. Skipper did not survive, and the stipulated "cause of death was multiple gunshot wounds to [Mr. Skipper's] head and torso." (Ex. O. *See also* Ex. I.)

{¶ 12} Following the shooting, Mr. Cameron walked to the other side of the hotel's parking lot and approached J.F., a stranger who was seated in the driver's seat of his parked truck. (Tr. Vol. II at 261-62. *See also* Ex. D2; Ex. D3; Ex. D5.) At trial, J.F. testified that a man opened the passenger door of his truck, pointed a gun at him, and threatened to blow his head off if he did not get out. (Tr. Vol. II at 261-62.) His account was supported by surveillance video played at trial depicting this encounter. (*See* Ex. D5.) J.F. testified he acquiesced, and the man got in his truck and drove off. (Tr. Vol. II at 262.)

{¶ 13} Shortly after the incident, police recovered J.F.'s truck at Ms. Howard-Smith's residence in Dayton. (*See* Tr. Vol. II at 262-63, 267-69; Tr. Vol. III at 337-40. *See also* Tr. Vol. II at 304-05; Ex. N at 35:48.) Although J.F. testified he did not know the person who took his truck (Tr. Vol. II at 262) and did not identify the perpetrator in the courtroom during trial, Mr. Cameron admitted to brandishing a firearm and taking a man's truck in the hotel parking lot after the shooting when he was interviewed by the police. (*See* Ex. N at 35:00, 38:30.)

{¶ 14} On April 5, 2021, law enforcement arrested Mr. Cameron in Dayton at his friend's Hillcrest Drive residence. (*See* Ex. N at 37:10; Tr. Vol. III at 340-41.) Police obtained and executed a search warrant on the Hillcrest Drive residence, recovering two firearms—including the one used in the shooting, a Taurus 9mm Luger pistol—during the search. (*See* Tr. Vol. III at 340-46; Ex. F. *See also* Ex. L1; Ex. L2.) That same day, after waiving his constitutional rights, Mr. Cameron voluntarily submitted to questioning by detectives from the Columbus Police Department while in custody. (*See* Tr. Vol. II at 305.) At trial, that video-recorded interview was played for the jury, over defense counsel's objection. (*See* Tr. Vol. II at 306-07.)

{¶ 15} Because Mr. Cameron attributes error to several trial matters, additional evidence and testimony presented at trial are further summarized within our analysis of each assignment of error.

{¶ 16} Following deliberations, the jury found Mr. Cameron guilty of purposeful murder and its corresponding three-year firearm specification. (Tr. Vol. IV at 452-53.) After the remaining two counts were tried to the bench, the trial court found Mr. Cameron guilty of aggravated robbery with its firearm specification and having a weapon while under disability. (Tr. Vol. IV at 454-55.)

{¶ 17} At the October 5, 2023 sentencing hearing, the trial court sentenced Mr. Cameron to an aggregate prison term of 24 years to life. His convictions and sentence were memorialized in the trial court's October 5, 2023 judgment entry.

{¶ 18} Mr. Cameron timely appealed from that judgment of conviction and raises the following three assignments of error for our review:

> [I.] THE TRIAL COURT ERRED WHEN IT DECLINED TO GIVE A SELF-DEFENSE INSTRUCTION.
>
> [II.] THE TRIAL COURT ERRED WHEN IT ADMITTED A REPORT AND TESTIMONY OF AN EXPERT WITNESS IN VIOLATION OF CRIM.R. 16(K).
>
> [III.] THE VERDICT ON COUNT THREE WAS SUPPORTED BY INSUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II. ANALYSIS

### A. First Assignment of Error: Refusal to Instruct Jury on Self-Defense

{¶ 19} In his first assignment of error, Mr. Cameron contends he was entitled to a self-defense jury instruction, as requested by his counsel during trial. Thus, he argues the trial court abused its discretion by refusing to give the instruction. Because we find Mr. Cameron failed to satisfy his burden of production by presenting legally sufficient evidence for every element of self-defense, we disagree.

#### 1. Legal Standard and Standard of Review

{¶ 20} Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder. *See, e.g., State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Ordinarily, a requested jury instruction should be given if it is a correct statement of law and applicable to the facts of the case, and if reasonable minds might reach the

conclusion sought from the requested instruction. *See, e.g., State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240.

{¶ 21} In this case, Mr. Cameron requested a jury instruction on the affirmative defense of self-defense, pursuant to R.C. 2901.05(B)(1), which provides, in relevant part:

> A person is allowed to act in self-defense * * * of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, * * * as the case may be.

{¶ 22} In cases involving claims of self-defense, two distinct burdens are contemplated by R.C. 2901.05(B). *See State v. Palmer*, ____Ohio St.3d ____, 2024-Ohio-539, ¶ 17-19.

{¶ 23} First, the defendant must satisfy his burden of production, meaning the trial evidence must " 'tend[] to support' "—or be legally sufficient to establish—defendant's contention that he used the force in self-defense. *Palmer* at ¶ 15, quoting R.C. 2901.05(B)(1). The standard for evaluating whether a defendant has presented legally sufficient evidence is " '[s]imilar[] to the standard for judging the sufficiency of the state's evidence.' " *Palmer* at ¶ 20, quoting *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 25. " '[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.' " *Id.*, quoting Messenger at ¶ 25. The Supreme Court of Ohio recently reiterated that "[t]his burden of production is 'not a heavy one and * * * might even be satisfied through the state's own evidence.' " *Palmer* at ¶ 20, quoting *Messenger* at ¶ 22, and citing *State v. Giglio*, 8th Dist. No. 112001, 2023-Ohio-2178 (self-defense jury instruction given on minimally sufficient evidence of self-defense).

{¶ 24} If a trial court finds the defendant has satisfied his burden of production, the burden then shifts to the state to prove, beyond a reasonable doubt, that the defendant did not use the force in self-defense. *See, e.g., Palmer* at ¶ 17-19; *Messenger* at ¶ 18-24; *State v. Knuff*, ____ Ohio St.3d ____, 2024-Ohio-902, ¶ 191; *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31. To satisfy its burden of persuasion, the state must disprove at

least one of the elements of self-defense. *See id.* However, the state's burden is not triggered until the defendant produces "legally sufficient evidence" for every self-defense element. *See Messenger* at ¶ 19, 25.

{¶ 25} At issue in this case is the trial court's determination that Mr. Cameron failed to meet his burden of production and, thus, was not entitled to the self-defense instruction.

{¶ 26} When considering whether the evidence presented at trial is sufficient to warrant a self-defense instruction, the trial court must view the evidence in favor of the defendant, may only consider the adequacy of the evidence presented, and cannot question its credibility. *See Palmer* at ¶ 21. If there is conflicting evidence, the instruction must be given to the jury. In other words, "[t]he question is not whether the evidence **should** be believed but whether the evidence, **if believed**, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in self-defense." (Emphasis sic and added.) *Palmer* at ¶ 21, citing *Messenger* at ¶ 25-26.

{¶ 27} We are mindful that a trial court " 'is in the best position to gauge the evidence before the jury and * * * determine whether the evidence adduced at trial was sufficient to require an instruction.' " *Id.*, quoting *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72. Accordingly, we review a trial court's refusal to give a requested jury instruction for an abuse of discretion under the facts and circumstances of the case. *See id.* at ¶ 16, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

{¶ 28} "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary or unconscionable." (Internal quotations omitted.) *State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, 171 Ohio St.3d 524, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it lacks any adequate determining principle and is not

governed by any fixed rules or standards.  *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), citing *Black's Law Dictionary* 96 (5th Ed.1979).  *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19.  A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter*, *Wright*, *Morris & Arthur*, *L.L.P. v. Frutta Del Mondo*, *Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.

{¶ 29} An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.).  *See also New Asian Super Mkt. v. Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

{¶ 30} Accordingly, reversal of a trial court's decision to deny a defendant's request for a self-defense instruction is only warranted if we find the trial court's attitude was unreasonable, arbitrary, or unconscionable.  *See Palmer* at ¶ 22, citing *Wolons* at 68.

### 2.  Analysis

{¶ 31} Mr. Cameron was entitled to a self-defense instruction if he produced evidence that: "(1) he was not at fault in creating the situation that led to the affray; (2) he had a 'bona fide belief' that he was 'in imminent danger of death or great bodily harm' and his only way to escape was by using [deadly] force; and (3) he did not violate a duty to retreat." *Palmer* at ¶ 23, quoting *Messenger* at ¶ 14, and *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).  Though, as to the third element, " 'a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be.' " *See Palmer* at ¶ 23, quoting R.C. 2901.09(B), and 2020 Am.S.B. No. 175.

{¶ 32} Regarding the first element of self-defense, it is without question that Mr. Skipper—not Mr. Cameron—was at fault in creating the situation giving rise to the affray. (*See* Tr. Vol. III at 355.)  The state concedes as much on appeal, though suggests the affray ended when Mr. Cameron ran off.  (Appellee's Brief at 7.)  However, the surveillance video footage showed Mr. Skipper punch Mr. Cameron first and then pursue Mr. Cameron after he ran a few feet away.  (*See* Ex. D2.)  As such, we find the evidence legally sufficient for this element.

{¶ 33} The state also agrees that Mr. Cameron did not have a duty to retreat under R.C. 2901.09(B) because, as a guest of the hotel, he had a right to be in the hotel's parking lot. (*See* Appellee Brief's at 7.) Thus, the evidence at trial was legally sufficient to support the third element of self-defense.

{¶ 34} Ultimately, our analysis of Mr. Cameron's first assignment of error turns on whether the evidence presented at trial was legally sufficient to support the second element of self-defense: that Mr. Cameron had an honest (or bona fide) belief he was in imminent danger of death or great bodily harm and his only way to escape was to use deadly force. For the following reasons, we find no abuse of discretion in the trial court's determination that it was not.

{¶ 35} To meet the burden of production for the second element of self-defense, Mr. Cameron "did not need to present adequate evidence that every reasonable person would have believed he was in imminent danger and that deadly force was necessary." *Palmer*, 2024-Ohio-539 at ¶ 25. Rather, Mr. Cameron "only needed to present adequate evidence that a reasonable person, under the same circumstances and with [Mr. Cameron's] same subjective beliefs and faculties, would have believed that he was in imminent danger and that deadly force was necessary." *Id.*, citing *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). To make this assessment, we must put ourselves in Mr. Cameron's position and consider his " 'particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack,' " in order to determine whether the evidence presented at trial was adequate to suggest Mr. Cameron " '*reasonably* believed [he] was in imminent danger.' " (Emphasis sic.) *Id.*, quoting *Thomas* at 330.

{¶ 36} It is true Mr. Skipper created the situation by walking up to Mr. Cameron, getting in his face, and punching him. And, it is true that Mr. Skipper followed Mr. Cameron—albeit, while walking—even after Mr. Cameron was struck and ran a few feet away. We also note that Ms. Howard-Smith attempted to physically and verbally calm Mr. Skipper down multiple times, both before and after he punched Mr. Cameron. Furthermore, it is without question that Mr. Skipper was several years younger and considerably larger than Mr. Cameron when the incident occurred. But, on review of all evidence and testimony presented at trial, and affording due deference to the trial court's

determination, we cannot say the trial court abused its discretion when it found the evidence was insufficient for the jury to receive an instruction on self-defense.

{¶ 37} In making that finding, the trial court explained as follows:

> All right. At this time, it's the Court's finding that there isn't sufficient evidence for the jury to consider self-defense at this time. While I understand that [Mr. Cameron] may have said at one point [during his April 5, 2021 interview with police] that he needed to defend himself or had the right to defend, the detectives questioned him repeatedly on that, trying to give him the chance to say that he feared for his life or for great bodily harm and acted in self-defense and he never responded to those questions in that way. He said that he didn't recall anything that happened after the point that he went behind the other car, and the statements that he made during the interview were about how upset he was about what he believed was the infidelity of his girlfriend. So at this time, the Court finds that there isn't sufficient evidence for the jury to consider self-defense.

(Tr. Vol. III at 362.)

{¶ 38} Mr. Cameron did not testify at trial—as was his right. So, the primary evidence relevant to the trial court's evaluation of whether sufficient evidence tended to show Mr. Cameron had a reasonable and honest belief that he was in imminent danger of death or great bodily harm was the statements he made during his April 5, 2021 interview with police and the surveillance videos from the hotel.

{¶ 39} In his interview with police, Mr. Cameron recalled moving away from the SUV to his left after he was struck in the face, seeing bright lights, and Ms. Howard-Smith appearing in a blur. (*See* Ex. N at 33:40.) But, Mr. Cameron explicitly denied remembering anything else that occurred before he stole J.F.'s truck—namely, pulling the gun out from his right hip and shooting Mr. Skipper. (*See* Ex. N at 35:00, 47:00, 51:00, 52:20, 57:00.) Though he broadly posited he used the firearm to protect himself (*see* Ex. N at 48:25, 49:45), Mr. Cameron never overtly claimed to believe he was in imminent danger of death or great bodily harm. Nor did he tell detectives he knew or believed Mr. Skipper had a gun or a weapon on him that night, or otherwise knew Mr. Skipper had a history of committing violent crimes. Mr. Cameron also did not allege to police that Mr. Skipper had ever threatened to harm him—immediately prior to the shooting or at any point before April 4, 2021—and did not attest to having any physical confrontations, or even negative

encounters, with Mr. Skipper prior to shooting him. Indeed, Mr. Cameron, Mr. Skipper, and Mr. Skipper's son had shared a hotel room the two nights before without issue.

**{¶ 40}** We emphasize that a defendant's burden of production for a self-defense instruction does not necessarily require a defendant to submit to police questioning or testify at his trial. But, it is incumbent upon a defendant claiming self-defense to offer evidence legally sufficient to establish the defendant's entitlement to that instruction. In some cases, surveillance video footage and eyewitness testimony, for instance, may suffice. This is not one of those cases, however.

**{¶ 41}** Although the surveillance video showed Mr. Skipper following Mr. Cameron after he punched him, Mr. Skipper moved at a slow pace. Additionally, neither the surveillance video nor Ms. Howard-Smith's testimony supports any finding that Mr. Skipper brandished or claimed to have a gun or other weapon. Similarly, nothing in Ms. Howard-Smith's account suggests Mr. Skipper threatened to—or had ever previously threatened to—harm Mr. Cameron at any point prior to the shooting. On review of the surveillance footage, we note that only 13 seconds elapsed from the time Mr. Skipper punched Mr. Cameron to when Mr. Cameron rapidly fired multiple shots, causing Mr. Skipper to fall to the ground. And, even as Mr. Skipper lay face down on the ground, Mr. Cameron shot him twice more.

**{¶ 42}** In sum, neither the surveillance video footage of the incident, Ms. Howard-Smith's eyewitness testimony, nor Mr. Cameron's statements to police even remotely suggest Mr. Cameron ever actually believed he was in imminent danger of death or serious bodily harm—much less support any finding that such belief would have been reasonable. Viewing the evidence presented in the light most favorable to Mr. Cameron, we thus conclude the evidence, even if believed, was legally insufficient to show that under the same circumstances, a reasonable person of Mr. Cameron's age and comparative size, with the same history and knowledge and in the same environment in which Mr. Cameron found himself, could have subjectively believed he was in imminent danger and deadly force was necessary.

**{¶ 43}** For these reasons, we find the trial court did not abuse its discretion in refusing to instruct the jury on self-defense. Accordingly, Mr. Cameron's first assignment of error is overruled.

**B. Second Assignment of Error:  Admission of Expert Evidence**

{¶ 44}   In his second assignment of error, Mr. Cameron argues the trial court erred in allowing the state to present the testimony and report of the state's firearms expert, Erica Mattie, regarding her analysis of the bullets removed from Mr. Skipper's body because that report was provided to defense counsel the week before trial.  Since the state's untimely production of that report (Ex. L2) violated Crim.R. 16(K)'s requirement that expert reports be disclosed to opposing counsel "no later than twenty-one days prior to trial," Mr. Cameron contends the trial court erred in allowing such evidence and testimony to be presented at trial.  For the following reasons, we disagree.

**1.  Legal Standard and Standard of Review**

{¶ 45} Crim.R. 16 governs discovery and inspection in criminal cases.  Relatedly, here, Crim.R. 16(K) addresses a party's disclosure of expert witnesses and reports.  That rule provides as follows:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. ***The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial****, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial*.

(Emphasis added.)

{¶ 46} The purpose of Crim.R. 16(K) is to prevent "either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report."  Crim.R. 16(K), 2010 Staff Notes.  In promoting "more open discovery" in criminal cases, Crim.R. 16(K)'s aim is to level the lopsided playing field by strengthening a defendant's right to know the evidence the state will present against him or her at trial.  *See State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, ¶ 44.

{¶ 47} Upon discovering that a party has failed to comply with Crim.R. 16 or any discovery orders, a trial court may, in a manner "not inconsistent with th[e] rule," continue

the case, prohibit the party from introducing in evidence the material not timely disclosed, or "make such other order as it deems just under the circumstances." Crim.R. 16(L)(1). "A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus.

{¶ 48} Violations of Crim.R. 16 by the state constitute reversible error "only when there is a showing that: (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

{¶ 49} A trial court has broad discretion over discovery matters, which means we review a trial court's ruling on a claimed discovery violation under Crim.R. 16 for an abuse of discretion. *State ex rel. Duncan v. Middlefield*, 120 Ohio St.3d 313, 2008-Ohio-6200, ¶ 27. Thus, reversal of a trial court's decision admitting expert testimony and evidence is warranted only if we find the trial court's attitude was unreasonable, arbitrary, or unconscionable. *See Weaver*, 2022-Ohio-4371 at ¶ 24, quoting *Adams*, 62 Ohio St.2d at 157.

### 2. Analysis

{¶ 50} At issue in this case is the September 21, 2023 ballistics report prepared by the state's firearms expert comparing the bullets recovered from Mr. Skipper's body to the test fires from the Taurus 9 mm Luger pistol recovered from the Hillcrest Drive home where Mr. Cameron was arrested. (*See* Ex. L2.) On the first day of trial, Mr. Cameron's counsel informed the trial court it received this report just four days before trial. (*See* Tr. Vol. I at 3; Ex. L2.) Thus, Mr. Cameron's trial counsel objected under Crim.R. 16(K) to the admission of evidence and testimony concerning the findings contained in that report. (*See* Tr. Vol. I at 3.)

{¶ 51} It is without question the state's production of this report was untimely under Crim.R. 16(K), as it was provided to defense counsel less than 21 days before trial. Nonetheless, the trial court found "that while the evidence was submitted beyond the 21-day period, * * * there is no prejudice in this matter so the Court will allow [Ms. Pattie's]

expert testimony to be provided in the case." (Tr. Vol. I at 6.) On appeal, Mr. Cameron argues this ruling constituted an abuse of discretion.

{¶ 52} In seeking to have evidence and testimony related to this report excluded from trial, defense counsel argued that the state's belated production of this report would prejudice Mr. Cameron. (*See* Tr. Vol. I at 3.) However, defense counsel did not ask for a continuance or explain precisely how—given that neither Mr. Cameron's identity as the person who shot Mr. Skipper nor Mr. Skipper's cause of death was in dispute—it believed Mr. Cameron would be prejudiced by the admission of such evidence. (*See* Tr. Vol. I at 3-10.)

{¶ 53} Indeed, long before trial commenced, the state provided defense counsel with an April 27, 2021 ballistics report indicating the spent shell casings recovered from the hotel parking lot were fired from the Taurus 9 mm Luger pistol seized from the Hillcrest Drive residence where Mr. Cameron was arrested. (*See* Ex. L1; Ex. F.) The state had also provided defense counsel with the coroner's report describing Mr. Skipper's gunshot wound injuries and photographs of bullets and bullet fragments recovered from Mr. Skipper's body during the autopsy. (Ex. I; Ex. J7; Ex. J8; Ex. J9; Ex. J10.) And, of course, defense counsel received video surveillance footage of Mr. Cameron shooting Mr. Skipper well in advance of trial. (Ex. D2; Ex. D3.) Taken together, this evidence is clearly indicative of the ultimate finding promulgated in the challenged report: that the bullets recovered from Mr. Skipper's body were fired from the gun Mr. Cameron used to shoot Mr. Skipper. Thus, we cannot see how Mr. Cameron could conceivably be prejudiced by evidence that forensically supported a foregone conclusion on issues not in dispute.

{¶ 54} Furthermore, the state provided an unrefuted explanation for its belated production of this report. Although the lead detective submitted a request for a comparison between the bullets recovered from Mr. Skipper's body and test fires from the Taurus 9 mm Luger pistol on May 20, 2021, the crime lab inexplicably failed to complete it. (*See* Ex. L2; Tr. Vol. I at 4-6.) During trial preparation in September 2023, the state learned about the crime lab's failure to promptly process this request and immediately informed defense counsel about the error. (*See* Tr. Vol. I at 3-6.) Nothing in the record before us suggests the delay in testing was anything but an oversight by the crime lab or otherwise refutes the representations made by the trial prosecutor to the court below on this matter.

{¶ 55} For these reasons, we find the trial court did not abuse its discretion in modifying the expert report disclosure deadline mandated by Crim.R. 16(K) for good cause shown upon concluding the modification would not prejudice Mr. Cameron.[1]  (*See* Tr. Vol. I at 6.)

{¶ 56}  Accordingly, we overrule Mr. Cameron's second assignment of error.

## C. Third Assignment of Error: Insufficient Evidence and Manifest Weight

{¶ 57}   In his third assignment of error, Mr. Cameron contends the evidence at trial was insufficient to support his aggravated robbery conviction.   He also argues his aggravated burglary conviction was against the manifest weight of the evidence.   For the following reasons, neither contention is well-taken.

### 1.  Legal Standard and Standard of Review

{¶ 58} Whether evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.  *See*, *e.g.*, *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 59}  In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense.  *See State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, citing *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt.  *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

---

[1] Even if we were to find the trial court erred by allowing this expert testimony and evidence to reach the jury, any such error would be harmless beyond a reasonable doubt since appellant's identity as the shooter and Mr. Skipper's cause of death were not in dispute. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 24 (explaining that Crim.R. 52(A) requires first a determination that the right affected by the error is "substantial" and then whether reversal is warranted because the accused was prejudiced).

{¶ 60} In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g., State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, citing *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387.

{¶ 61} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See, e.g., Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10; *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 62} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g., State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 63} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the

case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### 2. Analysis

{¶ 64} Following a bench trial, Mr. Cameron was convicted of aggravated robbery under R.C. 2911.01(A)(1), which provides:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

{¶ 65} On appeal, Mr. Cameron argues the state's evidence failed to sufficiently establish his identity as the person who took J.F.'s truck. In support, he points out that J.F. testified he did not get a good look at the perpetrator (Tr. Vol. II at 262), was never asked to view a photo array by police, and did not make an in-court identification. All of these claims are true. Although J.F. confirmed the video surveillance footage presented at trial accurately depicted the robbery incident (*see* Tr. Vol. II at 265-66, viewing Ex. D5), J.F. did not testify Mr. Cameron was the perpetrator depicted in that video. Mr. Cameron also notes that while Ms. Howard-Smith identified him in the other hotel surveillance videos (Exs. D1, D2, and D3), she was not asked to identify him in the surveillance video depicting the robbery (Ex. D5). (*See* Tr. Vol. II at 239-43.) This is also true.

{¶ 66} Nonetheless, we still find sufficient evidence to establish Mr. Cameron's identity as the perpetrator of the aggravated robbery offense. J.F. testified about his truck being stolen on the night of April 4, 2021 while he was in the parking lot of the same hotel as Mr. Cameron around the time the shooting occurred. The surveillance video supported that testimony. (*See* Ex. D3; Ex. D5.) Most critically, during his April 5, 2021 interview with police, Mr. Cameron ***admitted*** to pointing a gun at J.F. in the parking lot after the shooting and taking J.F.'s truck. (*See* Ex. N at 35:00, 38:30.) And, later in that same interview, Mr. Cameron expressed remorse for scaring J.F. that night. (*See* Ex. N at 50:15.) Thus, after reviewing the record, we find the state's evidence, if believed, sufficiently established that in attempting or committing a theft of J.F.'s truck, Mr. Cameron had a deadly weapon on

or about his person or under his control and either displayed, brandished, or indicated that he possessed that weapon, as required to support an aggravated robbery conviction under R.C. 2911.01(A)(1).

{¶ 67} Having found his sufficiency challenge to be without merit, we next turn to Mr. Cameron's contention that his aggravated robbery conviction was against the manifest weight of the evidence.

{¶ 68} Mr. Cameron's manifest weight challenge concerns the same identity issue raised in his challenge to the sufficiency of the evidence. However, having reviewed all evidence and testimony presented at trial regarding the aggravated robbery incident, as previously summarized above, we cannot conclude the trial court clearly lost its way when it found the state proved Mr. Cameron's identity as the person responsible for the theft of J.F.'s truck beyond a reasonable doubt. Accordingly, we find the trial court's verdict as to Count 3, the aggravated robbery offense, was not against the manifest weight of the evidence.

{¶ 69} For these reasons, we overrule Mr. Cameron's third assignment of error.

## III.  CONCLUSION

{¶ 70} Having overruled each of Mr. Cameron's three assignments of error, we affirm the October 5, 2023 judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

_____